UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: TIMOTHY CHARLES MOORE | : | Case No. 13-11090REF |
| and REBECCA JO MOORE, | : | Chapter 13 |
| Debtors | : | |

| | | |
|---|---|---|
| In re: RICHARD T. MOORE | : | Case No. 14-11692[1] |
| and CAROL J. MOORE, | : | Chapter 13 |

# MEMORANDUM OPINION

# I. INTRODUCTION

These cases involve a dispute between two banks over the right to the limited proceeds available for distribution from the sale of certain real property. Debtor in No. 13-11090, Timothy Charles Moore, and Debtor in No. 14-11692, Timothy's mother Carol J. Moore (together for this matter only, the "Moores") sold the property free and clear of all liens, including the mortgage liens of both banks, pursuant to 11 U.S.C. §363(f)(2)[2] and my orders dated October 23, 2014

---

[1]    Although the two banks that are the primary parties in this matter filed their motions for distribution only in Case No. 13-11090, my decision in this dispute unquestionably impacts the Debtors in Case No. 14-11692 every bit as much as it impacts the Debtors in No. 13-11090. I therefore include the 2014 case in the above caption and regard both cases as clearly subject to my decision herein. Debtor Timothy Charles Moore in No. 13-11090 is the son of Debtors in No. 14-11692.

[2]    Both banks consented to the sale free and clear, subject to distribution of the proceeds in accord with this decision.

(No. 13-11090) and December 18, 2014 (No. 14-11692), which orders approved the sale.

Before me for disposition are: (1) First Niagara Bank, N.A's ("First Niagara") Motion for Distribution of the Proceeds from the Sale of Debtors' [sic – unless First Niagara intended "Debtors" to reflect one Debtor from each of the two different cases] Real Estate; and (2) Embassy Bank for the Lehigh Valley's ("Embassy Bank") Cross-Motion for Distribution and Objection to First Niagara's Motion. I find and conclude that: (1) neither Harleysville National Bank and Trust Company ("Harleysville") nor its successor in interest First Niagara released the first mortgage lien against the property that was sold; and (2) Embassy Bank is not entitled to the status of a bona fide purchaser. I will therefore grant First Niagara's Motion for Distribution and deny Embassy Bank's Cross-Motion.

# II. BACKGROUND

## A. Factual History

By deed dated May 7, 2002, the Moores acquired title to property described in the deed as follows: "LOTS NOS. 8 and 9 on Plan of Town Lots known as "Laubach Estates" as revised January 22, 1921." The deed further recites that this property is also known as "NORTHAMPTON COUNTY UNIFORM PARCEL IDENTIFIER NO: MAP: L4SW4B, BLOCK: 5, LOT:1." Lots 8 & 9 had been combined at some preceding time to create the original Lot 1, described above. Although not set forth in the deed, the parties agree that at the time the Moores acquired original Lot 1, it had an assigned post office street address of 215 East 20th Street, Northampton, PA. The deed for original Lot 1 was recorded on May 17, 2002.

On July 6, 2004, the Moores granted to Harleysville a mortgage in original Lot 1 (the "First Mortgage"). The First Mortgage described the property that served as collateral as follows: "ALL THAT CERTAIN tract of land, with buildings and improvements situate in Northampton Co, Pennsylvania, being UPI NO. L4SW4B BLK LOT 1, otherwise known as Lots 8 & 9 Lincoln Ave., Northampton, PA and being more fully described in deed book 200021, page 128815, date of deed 05/07/02, located in Northampton Boro." The First Mortgage

3

further recites that "[t]he Real Property or its address is commonly known as 215 EAST 20th STREET, NORTHAMPTON, PA 18067. The Real Property parcel identification number is L4SW4B BLK 5 LOT 1." The First Mortgage was recorded on July 20, 2004.

On March 23, 2005, the Moores recorded a subdivision map through which they subdivided original Lot 1, Northampton County, Uniform Parcel Identifier No: Map: L4SW4B, Block: 5, Lot:1, into two lots. The subdivision map refers to the newly created subdivided lots as Lots 1 & 2.[3]

Sometime in August of 2005, the Moores asked Harleysville to release the mortgage lien it held against Lot 2 (aka Lot 1A), formally described as Uniform Parcel Identifier No. L4SW4B, Block 5, Lot 1A. Harleysville was satisfied that the value of the residual lot (Lot 1) was sufficient to adequately collateralize the balance of the loan. Harleysville therefore granted the request and executed a release of Lot 2 (aka Lot 1A) from the First Mortgage dated August 24, 2005 (the "Release"). The Release was recorded on September 6, 2005, and

---

[3] I was unable to discern if former Lots 8 and 9 were divided precisely into new Lots 1 and 2 with metes and bounds identical to Lots 8 and 9. I do not need to resolve that lack of discernment, which is something I raise simply out of curiosity.
Lot 2 is sometimes referred to as Lot 1A.

describes the property being released from the mortgage as follows: "Parcel No: Lot 2, Map L4SW4B, Block 5, Lot 1A."[4]

The lot subject to the Release is referred to herein as Lot 2 and the residual lot from which Lot 2 was separated by the subdivision is referred to herein as Lot 1. The only property described in the Release was Lot 2. The Release did not mention Lot 1. Harleysville did not release the First Mortgage lien on Lot 1 through the Release. Nothing in the record shows that either Harleysville or First Niagara released any other property from the lien of the First Mortgage. I find and conclude, therefore, that Harleysville/First Niagara never released Lot 1 from the First Mortgage.

On April 11, 2006, the Moores executed a deed conveying to themselves the residual property "shown as Lot 1 on the subdivision plan for Timothy C. and Carol J. Moore." The deed further describes the property being conveyed as "ALSO KNOWN AS NORTHAMPTON COUNTY PARCEL NO.: L4SW4B, Block 5 Lot 1." On May 31, 2006, the Moores granted two mortgages to Wachovia Bank, for which Lot 1 was the mortgaged collateral. Because neither Harleysville nor First Niagara had released the lien of the First Mortgage against Lot 1, the Wachovia mortgages enjoyed second and third lien status against Lot 1.

---

[4] The Release also refers to the property being released from the First Mortgage as "215 East 20th Street, Northampton, PA 18067," apparently because a new post office street address had not yet been assigned to Lot 2 (aka Lot 1A).

5

On August 21, 2007, the Moores applied for a commercial loan from Embassy Bank in the amount of $136,000 to refinance the Wachovia mortgages. At the time of the application, the amount owed and secured by the two Wachovia mortgages totaled approximately $95,000. The agreement between Embassy Bank and the Moores was that Embassy Bank would be granted a first mortgage lien against Lot 1. Nothing in the record suggests that either Harleysville or First Niagara was a party to Embassy Bank's agreement with the Moores.

Embassy Bank's internal policy at the time of its loan provided that title insurance need not be obtained for commercial loans of $150,000 or less. Embassy Bank therefore did not order a full title search and report on residual Lot 1 and did not purchase title insurance to insure its intended place as a first lienholder. Instead, Embassy Bank ordered and received what is described as a "full current" title report from Pro-Search, Inc. (Exhibit EB6). The title search failed to reveal the existence of Harleysville's preexisting First Mortgage lien against Lot 1.[5]

---

[5] Embassy Bank also ordered credit reports on the Moores. The credit reports failed to reveal (1) any indebtedness owed by the Moores to Harleysville or (2) the First Mortgage on Lot 1, securing the Harleysville debt. Embassy Bank's witness testified that sometimes commercial transactions do not appear on credit reports, which might explain why neither the indebtedness owed by the Moores to Harleysville nor the pre-existing First Mortgage on Lot 1 appeared on the credit reports. I regard the issue, if any, relating to the lack of information in the credit reports as extraneous to this dispute.

## B. The Bankruptcy Proceeding and the Sale of Lot 1

On February 7, 2013, Timothy Charles Moore and his wife, Rebecca Jo Moore (together, "Debtors1"), filed their petition initiating their Chapter 13 case. On March 6, 2014, Richard T. Moore and his wife, Carol J. Moore (together, "Debtors2") filed their petition initiating their Chapter 13 case. Debtors1 and Debtors2 filed a number of motions and amended motions[6] to sell Lot 1 free and clear of liens. My October 23, 2014 order, granted a motion of Debtors1 to sell Lot 1 and permitted the payment at closing of ordinary, customary, and reasonable closing costs from the proceeds of the sale. The October 23 Order directed that the remaining, net proceeds from the sale of residual Lot 1 be held by counsel for Debtors1 and distributed to the lienholders according to the priority determined after notice and a further hearing on the banks' respective interests. My December 18, 2014 order, granted a motion of Debtors2 to sell Lot 1 and permitted the payment at closing of ordinary, customary, and reasonable closing costs from the proceeds of the sale. The December 18 Order directed that the remaining, net proceeds from the sale of residual Lot 1 be held by counsel for Debtors2[7] and distributed to the lienholders according to the priority determined after notice and a further hearing on the banks' respective interests. As noted above, both banks had

---

[6]   The efforts to sell Lot 1 were a bit complicated, in part because the banks in this matter disputed which bank should receive the distribution of the net proceeds from the sale of Lot 1.
[7]   Counsel for Debtors1 is also counsel for Debtors2.

7

consented to the free and clear sale of Lot 1 and to the payment of the closing costs.

The Moores sold Lot 1 for $125,000.[8] I held a hearing on January 21, 2015, on First Niagara's Motion and Embassy Bank's Objection and Cross-Motion. Post-hearing briefs have been filed and the Motion and Cross-Motion are ready for disposition. The Banks, Debtors1, and Debtors2 have agreed that I have both the subject matter jurisdiction and the power to issue a final decision in this matter. This Memorandum Opinion constitutes my findings of fact, conclusions of law, and discussion of my decision.

---

[8] The parties concede that the net proceeds are insufficient to satisfy both First Niagara's debt and Embassy Bank's debt.

# III. <u>DISCUSSION</u>

## A. <u>Release of Lot 2 from the First Mortgage</u>

I begin by noting that counsel for both Banks approached the January 21, 2015 hearing in a cooperative, informal fashion. Each counsel stipulated to the admissibility of the other party's exhibits. Each counsel began their presentation by explaining the exhibits that they intended to admit. Counsel for First Niagara called no witnesses; counsel for Embassy Bank called one witness -- Mr. Terry Stecker, Senior Vice President with Embassy Bank. Mr. Stecker testified about the intentions of Embassy Bank and the Moores concerning the Embassy Bank loan and mortgage and the steps that Embassy Bank took to verify its anticipated first lien position. His testimony is relevant to whether the parties to the loan intended that Embassy Bank receive a first lien on Lot 1. It is also relevant to, but not dispositive of, whether Embassy Bank exercised due diligence prior to approving the loan and recording its mortgage. Mr. Stecker's testimony, however, does not fully address or resolve the factual issues at the heart of the banks' dispute.

The focus of the dispute is twofold: (1) Did Harleysville release its First Mortgage lien on Lot 1; and (2) if it did not, was Embassy Bank a bona fide purchaser who lacked actual and constructive notice of First Niagara's First Mortgage lien on Lot 1? To answer these questions I analyze, first, the effect of the

Release and, second, whether Embassy Bank's "full current" title report was sufficient to render Embassy Bank a bona fide purchaser. The evidence presented by the parties does little to aid me in resolving these issues and leaves a sparse record for my consideration.[9]

I have, however, pieced together the facts by reviewing the stipulated exhibits and considering the testimony from the hearing. Based on the evidence, I find that neither Harleysville nor First Niagara released the First Mortgage lien on Lot 1. First Niagara therefore retained its first lien status on Lot 1.

Embassy Bank emphasizes that the Release describes the property released from the First Mortgage by referring to a street address of 215 East 20th Street, Northampton, PA. The parties agree that at some time after the property was subdivided, Lot 1 continued to be known as 215 East 20th Street and Lot 2 became known as 209 East 20th Street. The record contains no evidence about when a change in the post office assigned street address occurred. It appears that a tiny, handwritten notation on the subdivision map places the number "209" on Lot 2. No evidence was presented to establish whether or when Lot 2 was officially given this post office assigned street address. Because the number is handwritten

---

[9] In an ideal world, the record would contain expert testimony detailing the results of a full title search on Lot 1 compared to different types of title searches and title reports available to a lender. Expert testimony would include a detailed explanation of the Pro-Search "full current" title report obtained by Embassy Bank and the types of title searches/reports that a prudent and reasonable lender would order before extending a loan secured by a mortgage. This expert evidence is absent from the record. I am therefore left to decide this matter based on the stipulated exhibits and the testimony of the lone witness.

on the subdivision map, when all other items on the subdivision map are printed, I draw on my years of experience analyzing subdivisions and surmise that the number "209" was handwritten on the subdivision map after it was recorded.

If Lot 2 was not officially given the post office assigned street address of 209 East 20th Street until after Harleysville executed and recorded the Release, the recitation in the Release of the post office assigned street address for Lot 2 as 215 East 20th Street is of no consequence and is irrelevant to resolution of this dispute. In fact, if this is the case, 215 East 20th Street is an accurate description of the post office assigned street address of both Lot 1 and Lot 2 as of the date of the Release.

Regardless, it is well established that the failure of a recorded document to state the correct post office assigned street address does not negate the notice otherwise given by a properly recorded document. For purposes of identifying a particular piece of real property in Pennsylvania, an accurate legal description controls over a post office assigned street address that might also be recited in the document. My colleague Judge Robert Opel reviewed this issue in Fedor v. Am. Home Mortg. Servs., Inc., (In re Fedor), Bankruptcy No. 5–08–bk–52485 RNO, Adversary No. 5–08–ap–50176 RNO, 2009 WL 1173047, at *5 (Bankr. M.D. Pa. April 30, 2009).

In Fedor, Judge Opel first correctly noted that property interests in bankruptcy are defined by state law. Id. He then determined that, under Pennsylvania law, the failure of a mortgage to state the correct street address does not negate the notice given by an otherwise properly recorded mortgage. Id. For the purpose of identifying real estate, he concluded, an accurate metes and bounds and PIN identification controls over an inaccurate street address. Id. See also Wagner v. Christiana Bank & Trust Co. (In re Wagner), 353 B.R. 106, 119 (Bankr. W.D. Pa. 2006); In re Dupell, 235 B.R. 783, 787 n.3 (Bankr. E.D. Pa. 1999).

In the dispute before me, the Release accurately identifies Lot 2 as the property being released from the lien of the First Mortgage as follows: "Parcel No: Lot 2, Map L4SW4B, Block 5, Lot 1A." This description controls over the reference in the Release to the post office assigned street address of 215 East 20th Street.[10] The Release was properly recorded and therefore gave competent notice to subsequent purchasers and mortgagees that Harleysville had released its First Mortgage lien on Lot 2 alone, but had left intact its First Mortgage lien on Lot 1. Fedor, 2009 WL at 1173047 at *5; Wagner, 353 B.R. at 119.

---

[10]    As I noted earlier, the record contains no evidence about when Lot 2 was assigned the post office street address 209 East 20th Street. So, although the street address does not control, I cannot know whether the reference in the Release to 215 East 20th Street was accurate or inaccurate as of the date of the Release.

12

## B. Embassy Bank as a Bona Fide Purchaser

Embassy Bank next argues that it is a bona fide purchaser entitled to priority over the First Mortgage because the "full current" title report it ordered from Pro-Search, Inc., failed to uncover the existence of the First Mortgage on Lot 1. I must disagree.

Under Pennsylvania law, a bona fide purchaser is one who purchases real property without actual or constructive notice of a third party's claim and who therefore takes the property free and clear of that claim. Lund v. Heinrich, 189 A.2d 581, 584 (Pa. 1963). "Constructive knowledge . . . consists of what a purchaser of debtors' property would have discovered from inspecting the public record in the office of the recorder of deeds as well as from inquiring of the person in possession of the property . . .." In re Aulicino, 400 B.R. 175, 184 (Bankr. E.D. Pa. 2008) quoting Accredited Home Lenders v. Lauver (In re Lauver), 372 B.R. 751, 760 (Bankr. W.D. Pa. 2007).

A purchaser loses his claim to bona fide purchaser status under Pennsylvania law if he fails to conduct a full title search. Sabella v. Appalachian Dev. Corp., 103 A.3d 83, 104 (Pa. Super. 2014); see generally Best v. Galloway (In re Best), 417 B.R. 259, 281 (Bankr. E.D. Pa. 2009); Aulicino, 400 B.R. at 184. The specific definition of a "full current" title report is lacking in the record before me. From my review of Pro-Search's "full current" title report (Exhibit EB6), I

13

conclude that it is based on a search of the records beginning on the date the current owner (the Moores) allegedly acquired Lot 1. See generally Express Financial Services, Inc. v. Gateway Abstract Co., No. 9144 CV 2001, 2004 WL 3426106 at *1, 71 Pa. D. & C. 4th 344, 346 (Pa. Comm. Pl. Aug. 20, 2004) (Monroe County).

The Moores are the record owners listed on the Pro-Search "full current" title report. The Pro-Search "full current" title report incorrectly indicates that the Moores first acquired Lot 1 by a deed (from themselves) dated April 11, 2006 (recorded April 24, 2006).[11] In fact, however, the Moores first acquired the property (original Lot 1) on May 7, 2002 and enjoyed uninterrupted title to both original Lot 1 and residual Lot 1 since that date. The only liens identified in the Pro-Search "full current" title report against Lot 1 are the Wachovia liens (which were recorded after April 11, 2006). This information plus the failure of the Pro-Search "full current" title report to list (1) the original acquisition date for Lot 1 (May 7, 2002) and (2) the existence of the First Mortgage (recorded on July 20, 2004) are critical. I find and conclude that the Pro-Search "full current" title report conducted its search of the records from April 11, 2006 forward, thereby relying on the wrong date of acquisition. The Pro-Search "full current" title report failed to

---

[11] This seems to be the source of the problem in this case. Pro-Search began its title search from the wrong date. Had Pro-Search searched the real estate records from May 7, 2002 forward, it would have uncovered the existence of the First Mortgage encumbering Lot 1.

14

uncover the First Mortgage against Lot 1 because the search upon which the report was based erroneously began as of April 11, 2006. The Moores acquired original Lot 1 in May 2002, the First Mortgage was recorded in 2004, and the property was subdivided in 2005, all of which occurred before the effective date of the Pro-Search search and report.

Embassy Bank chose to utilize a "full current" title report, as opposed to a full title report with a longer look-back period, because it was Embassy's internal corporate policy not to require title insurance or a full title search when the loan at issue involved proceeds of $150,000 or less. Embassy Bank made the business decision that it was not worth paying for a full title search and title insurance on loans that were not in excess of $150,000. Embassy Bank chose to take the risk that a title problem might surface on loans of $150,000 or less, which is precisely what occurred in this case. Had Embassy Bank ordered a full title search that either properly searched the title from the date the Moores first acquired the property or that used a longer look back period, the First Mortgage against Lot 1 would have been discovered. The Pro Search "full current" title report on which Embassy Bank relied was both insufficient and defective. It therefore does not qualify as the full title search required of a mortgagee to gain the status of a bona fide purchaser. Sabella, 103 A.2d at 104.

As such, Embassy Bank is not entitled to the protections of a bona fide purchaser and the lien of the First Mortgage takes clear priority over the mortgage lien of Embassy Bank.[12]

---

[12] The result in this case is consistent with the longstanding policy behind the bona fide purchaser rule, which was stated by the Pennsylvania Supreme Court as "Where one of two innocent persons must suffer, he whose neglect makes the injury possible must bear the responsibility." Lund, 189 A.2d at 584.

# IV. **CONCLUSION**

Based on the above discussion, I find and conclude: (1) The lien of the First Mortgage of Harleysville/First Niagara on Lot 1 is entitled to first priority lien status; and (2) Embassy Bank is not entitled to claim the status of a bona fide purchaser. My order granting First Niagara's Motion for Distribution and denying Embassy Bank's Cross-Motion for Distribution accompanies this Memorandum Opinion.

BY THE COURT

Date: March 31, 2015

_____
RICHARD E. FEHLING
United States Bankruptcy Judge