UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: TIMOTHY CHARLES MOORE and REBECCA JO MOORE, Debtors | : : : | Case No. 13-11090REF Chapter 13 |
| In re: RICHARD T. MOORE and CAROL J. MOORE, | : : | Case No. 14-11692REF[1] Chapter 13 |

# MEMORANDUM OPINION

## I. INTRODUCTION

These cases involve a dispute between two banks over the right to the limited proceeds available for distribution from the sale of certain real property. Debtor in No. 13-11090, Timothy Charles Moore, and Debtor in No. 14-11692, Timothy's mother Carol J. Moore (together for this matter only, the "Moores") sold the property free and clear of all liens, including the mortgage liens of both banks, pursuant to 11 U.S.C. §363(f)(2)[2] and my orders dated October 23, 2014

---

[1] Although the two banks that are the primary parties in this matter filed their motions for distribution only in Case No. 13-11090, my decision in this dispute unquestionably impacted and continues to impact the Debtors in Case No. 14-11692 as much as it impacted and continues to impact the Debtors in No. 13-11090. I therefore included and continue to include the 2014 case in the above caption and once again regard both cases as subject to my decision herein. Debtor Timothy Charles Moore in No. 13-11090 is the son of Debtors in No. 14-11692.

[2] Both banks consented to the sale free and clear, subject to distribution of the proceeds in accord with my decision.

(No. 13-11090) and December 18, 2014 (No. 14-11692), which orders approved the sale. Depending upon resolution of this dispute, all of the proceeds from the sale will be distributed to one of the banks and none will be distributed to the other.

Before me for disposition were and are again: (1) First Niagara Bank, N.A's ("First Niagara") Motion for Distribution of the Proceeds from the Sale of Debtors' [sic – unless First Niagara intended "Debtors" to reflect one Debtor from each of the two different cases] Real Estate; and (2) Embassy Bank for the Lehigh Valley's ("Embassy") Cross-Motion for Distribution and Objection to First Niagara's Motion. Through my Memorandum Opinion and Order on March 31, 2015, I found and concluded that: (1) Neither Harleysville National Bank and Trust Company ("Harleysville") nor First Niagara, Harleysville's successor in interest, released the first mortgage lien against the property that was sold; and (2) Embassy is not and was not entitled to the status of a bona fide purchaser ("BFP"). I therefore granted First Niagara's Motion for Distribution and denied Embassy's Cross-Motion.

Embassy appealed from my decision. By his decision on March 31, 2016, District Court Judge Timothy Savage, affirmed my decision that Embassy was not a BFP in this matter. The issue of Embassy as a BFP is therefore not before me in this remand. Judge Savage also noted that under the law as expressed in several state and federal courts, I may have been obliged to rely on the metes

2

and bounds description of the released property rather than other descriptions. He remanded the case for me to explain why I had declined to use the metes and bounds description in the Release[3] at issue here. I was mistaken in my failure to provide an explanation in my initial decision. This Memorandum Opinion does just that by providing the basis for my decision that using the metes and bounds description found in the exhibit to the Release would constitute manifest error, incorrectly allowing the sale proceeds to be paid to Embassy rather than to First Niagara. My rationale for deciding to forego the metes and bounds is the sole issue on remand and is the sole issue addressed in this Memorandum Opinion.

## II. BACKGROUND

Harleysville[4] was negligent in carelessly attaching an incorrect metes and bounds description to the Release. On the other hand, Embassy intentionally declined to take the step (a full title search) that would have prevented this entire mix-up from occurring. Much of the following factual history reiterates facts from my March 31, 2015 decision. I have included, however, certain additional facts and

---

[3]  "Release" is defined below.
[4]  Again, Harleysville is the predecessor of First Niagara, the party to this litigation. I will refer to Harleysville in the factual discussion of who did what to whom and when. When I discuss the parties' present arguments, I will refer to First Niagara.

discussion that led me to my initial decision – facts and discussion that I had neglected to include in my original decision.

By deed dated May 7, 2002, the Moores acquired title to property described in the deed as follows: "LOTS NOS. 8 and 9 on Plan of Town Lots known as "Laubach Estates" as revised January 22, 1921." The deed further recites that this property is also known as "NORTHAMPTON COUNTY UNIFORM PARCEL IDENTIFIER NO: MAP: L4SW4B, BLOCK: 5, LOT:1." Lots 8 & 9 had been combined at some preceding time to create the original Lot 1, described above. Although not set forth in the deed, the parties agree that at the time the Moores acquired original Lot 1, it had an assigned post office street address of 215 East 20th Street, Northampton, PA. The deed for original Lot 1 in the name of the Moores was recorded on May 17, 2002.

On July 6, 2004, the Moores granted to Harleysville a first priority mortgage in original Lot 1 (the "First Mortgage"). The First Mortgage described the property that served as collateral as follows: "ALL THAT CERTAIN tract of land, with buildings and improvements situate in Northampton Co, Pennsylvania, being UPI NO. L4SW4B BLK LOT 1, otherwise known as Lots 8 & 9 Lincoln Ave., Northampton, PA and being more fully described in deed book 200021, page 128815, date of deed 05/07/02, located in Northampton Boro." The First Mortgage further recites that "[t]he Real Property or its address is commonly known as 215

4

EAST 20th STREET, NORTHAMPTON, PA 18067. The Real Property parcel identification number is L4SW4B BLK 5 LOT 1." The First Mortgage was recorded on July 20, 2004.

On March 23, 2005, the Moores recorded a subdivision map through which they subdivided original Lot 1, which was Northampton County, Uniform Parcel Identifier No: Map: L4SW4B, Block: 5, Lot:1, into two lots. The subdivision map refers to the newly created subdivided lots as Lots 1 & 2.

Sometime in August of 2005, the Moores asked Harleysville to release the First Mortgage lien it held against Lot 1A, described as Uniform Parcel Identifier No. L4SW4B, Block 5, Lot 1A. Harleysville was satisfied that the value of the residual lot (Lot 1) was sufficient to adequately collateralize the balance of the loan. Harleysville therefore granted the request and executed a release of Lot 1A from the First Mortgage dated August 24, 2005 (the "Release"). The Release was recorded on September 6, 2005. The body of the Release describes the property being released from the mortgage as follows: "Parcel No: Lot 2, Map L4SW4B, Block 5, Lot 1A."[5]

The only property described in the body of the Release was Lot 1A. The body of the Release did not mention Lot 1. Harleysville did not release the

---

[5]     The Release also refers to the property being released from the First Mortgage as "215 East 20th Street, Northampton, PA 18067," apparently because a new post office street address had not yet been assigned to Lot 2 (aka Lot 1A).

5

First Mortgage lien on Lot 1 through the language in the body of the Release. My factual statement in the original Memorandum Opinion that nothing in the record showed that either Harleysville or First Niagara released any other property from the lien of the First Mortgage was an error. This is so because Harleysville negligently included an incorrect exhibit/attachment to the Release.

The exhibit that Harleysville attached to the Release was a page from the original deed, recorded, on May 17, 2002, conveying the original Lot 1 to the Moores. The exhibit to the release stated the metes and bounds of both of original Lot 8 and original lot 9 that the Moores acquired, which had been combined into the original Lot 1. In other words, although the body of the Release released only Lot 1A, the exhibit attached to the Release included the metes and bounds description of the entire original Lot 1, which was both Lot 1A and Lot 1. I had failed to recognize Harleysville's error in my original decision.[6]

The issue then becomes: How did the parties, Harleysville and the Moores, look at the Release?

---

[6] Embassy failed to argue in the original (before the remand) pleadings and briefs that the metes and bounds description in the exhibit to the Release was the controlling description I must use. To the contrary, Embassy mentioned the attachment to the Release twice, seemingly in passing. First, Embassy quoted Harleysville's reference to the incorrect legal description as having been taken from the earlier mortgage in error. Second, Embassy included the exhibit's incorrect metes and bounds when it described the three contracting descriptors of the released property.
Nowhere in its briefs or in its oral arguments did Embassy claim that Harlyesville had actually released or, more importantly, intended to release the entire original, unsubdivided Lot 1.

6

The emails in evidence relating to the discussions between Harleysville and the Moores unquestionably show that neither Harleysville nor the Moores intended to release the entire original Lot 1.[7] When the Release was recorded, the Northampton County Recorder of Deeds accepted it and docketed it solely as releasing the subdivided Lot 1A.[8] Through all of the arguments and pleadings in this matter, both at my first consideration of the issue and now on remand, no party has claimed that Harleysville actually intended to release the entire original Lot 1.[9]

## III. DISCUSSION

A number of Pennsylvania decisions direct me, as a matter of law, to disregard the metes and bounds description in certain unusual cases. I now have

---

[7] See Exhibit FN-E. When Embassy's counsel objected to the admission of the email chain, I overruled him. I noted then and I confirm now that they show Harleysville's intention at the time of the preparing and recording the Release. Now, as I suggested I might, I find that the email chain is persuasive in establishing Harleysville's intent, which is critical in determining what property was released.

[8] See Exhibit FN-H and FN-I. The Landex exhibits show how the Release was received and, more importantly, how it was indexed by the Northampton County Recorder of Deeds.

[9] See fn. 5, supra.

Counsel for Embassy candidly acknowledged as much in argument on May 25, 2016. The oral record at 2:33.34 - 2:34:10 P.M is as follows:
    THE COURT: "You have two documents connected. One somebody actually had to type. 'Lot 1A is released.' The other – they slapped it on. Which do you think was real? . . . Do you really believe that somebody typed that out on the Release - - - ?"
    MR. SEITZ: "No. No."
    THE COURT: "And attached the deed and that the bank First Niagara intended to release the whole mortgage?"
    MR. SEITZ: "No I don't Your Honor. But I don't think that's the point. . . ."

before me one of those unusual cases. Only in its appeal from my first decision against it did Embassy latch on to the mistakenly attached exhibit to the Release.

Pennsylvania law is clear that "the construction of a [recorded document] must be governed by the intention of the parties at the time of the transaction, as gathered from a reading of the entire [recorded document]." Craig v. Craig, 56 Pa. D. & C. 4th 353, 356 (Butler Co. March 8, 2002) citing Empire Mining & Dev. Inc. v. Dep't of Envtl. Res., 678 A.2d 1218 (Pa. Commw. Ct. 1996). When a recorded document is ambiguous or if there is an allegation of mutual mistake, all attending circumstances must be considered to determine the intent of the parties. Craig, 56 Pa. D. & C. 4th at 536; see also Koch v. Dunkel, 90 Pa. 264, 269 (1879) ("If . . . there was any ambiguity in the [recorded document], . . . or any mutual mistake, the agreement [between the parties] was properly admitted [to show the intent of the parties]).

The recorded Release was ambiguous and contradictory between the body of the Release and its exhibit. All attending circumstances must be considered to determine the intent of the parties to the Release. Every aspect of the discussions and procedures that occurred at the time of the Release was intended to release only Lot 1A, rather than both Lot 1 and Lot 1A.

The Pennsylvania Superior Court stated in Wagner v. Landisville Camp Meeting Ass'n, 24 A.3d 374, 378 (Pa. Super. 2011), "'Where a deed or

agreement or reservation therein is obscure or ambiguous, the intention of the parties is to be ascertained in each instance not only from the language of the entire written instrument in question, but also from a consideration of the subject matter and of the surrounding circumstances.' Amerikohl Mining Co. Inc. v. Peoples Natural Gas Co., 860 A.2d 547, 550 (Pa. Super. 2004) (citation omitted)."

The Wagner court further summarized Pennsylvania law: "'Thus, in construing [a] deed, it is the intention of the parties at the time of the transaction that governs.' Id. (citing Stewart v. Chernicky, 439 Pa. 43, 49, 266 A.2d 242 (1970)). Where an ambiguity arises, 'we favor the construction of the agreement which makes it fair and rational, not the construction which makes it unusual or inequitable.' Id. (Citing Stewart, at 50, 266 A.2d at 263). See also Yuscavage v. Hamlin, 391 Pa. 13, 137 A.2d 242 (1958) (Looking to recital portion of deed to infer intent of parties where operative part of deed is uncertain)."

The proverbial bottom line, therefore, is to note that three different descriptors of the property to be released exist in the Release. The Release is obscure and ambiguous and the true intention of the parties cannot be discerned from the contradictory and confusing language of the Release. Nothing in the record supports the notion that Harleysville intended for a moment to release the entire Lot 1 from the lien of its mortgage. To the contrary, all of the evidence shows that Harleysville and the Moores intended to only release Lot 1A from the

9

Harleysville first mortgage lien. Construing the Release as releasing only Lot 1A and not both Lot1A and Lot 1 is the only construction that is "fair and rational." Construing the Release as releasing the entire lot, including both Lot 1 and Lot 1A, would be a construction that is "unusual [and] inequitable."

# IV. **CONCLUSION**

Based on the above discussion, I find and conclude that Harleysville did not intend to release and in fact did not release the subdivided Lot 1 from its mortgage.

My order once again granting First Niagara's Motion for Distribution and denying Embassy Bank's Cross-Motion for Distribution accompanies this Memorandum Opinion.

BY THE COURT

Date: June 28, 2016

_____
RICHARD E. FEHLING
United States Bankruptcy Judge